RECEIVED
JUN 27 2006
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____ DEPUTY CLERK

FILED
JUL 13 2006
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____ DEPUTY CLERK

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| ELIODORO TAPIA, individually and as the representative of the ESTATE OF LeTISHA TAPIA, and as the next friend of E.T., a minor child, CHARLOTTE DeHOYOS, and GERARD HUNGERFORD<br>          Plaintiffs<br>v.<br><br>ERIC DUGGER, GUILLERMO MIJARES, LUCIANO REYES, YESICA PEREZ, AMELIA MALDONADO, MARY ZUBOV-ZUNIGA, DENISE AUSTIN, SARAH QUINTERO, ALICIA RAMIREZ, and UNKNOWN SECURITY GUARDS in their individual capacities WARDEN SCOTT in his official and individual capacities, GEO GROUP, UNITED STATES OF AMERICA, VAL VERDE COUNTY and D'WAYNE JERNIGAN, SHERIFF OF VAL VERDE, COUNTY, in his official capacity<br>          Defendants | CIVIL ACTION NO.<br><br>SA-06-CA-0147-XR |

## PLAINTIFFS' FIRST AMENDED COMPLAINT

Plaintiffs Eliodoro Tapia, Charlotte DeHoyos, and Gerard Hungerford respectfully file this amended complaint and would show:

### STATEMENT OF CLAIM

1. Plaintiffs Eliodoro Tapia, Charlotte DeHoyos, and Gerard Hungerford bring this civil rights action for injunctive, declaratory, and monetary relief, seeking redress from Defendants for the death LeTisha Tapia, while incarcerated in the Val Verde County Jail.

2. Plaintiffs complain that Defendants are liable for the deprivation of Mrs. Tapia's constitutional rights under color of law and in violation of the Eighth and Fourteenth Amendments to the United States Constitution, and for violations of Titles II and III of the

Americans with Disabilities Act, 42 U.S.C. § 12131 ("ADA"), and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504").

3. Plaintiffs also bring supplemental actions under the Texas Wrongful Death Act, the Texas Survival Statute, and the Texas Tort Claims Act.

## JURISDICTION AND VENUE

4. This action is brought pursuant to 42 U.S.C. §§ 1983, 1988, the ADA, and Section 504. Jurisdiction is based on 28 U.S.C. §§ 1331, 1343(a)(3)(4), and 2201 and the aforementioned federal statutory and constitutional provisions.

5. Plaintiffs further invoke the supplemental jurisdiction of this Court, pursuant to 28 U.S.C. § 1367(a), to consider their state law claims.

6. Venue is proper in this court under 28 U.S.C. § 1391(b)(1) because Defendant Mary Zubov-Zuniga resides in this district. Venue is proper in this court under 28 U.S.C. § 1391(c) because Defendant GEO maintains a regional corporate office in New Braunfels, within this district.

7. For purposes of Plaintiffs' claims against the United States, this Court has jurisdiction under the Federal Tort Claims Act, 28 U.S.C. § 2675(a) (2006). Plaintiffs filed an administrative claim with the United States Marshals Service, which was rejected. A copy of the letter denying Plaintiffs' administrative claim is attached as Exhibit 1.

## PARTIES

8. Mr. Tapia, widower of LeTisha Tapia, sues in his individual capacity and as the representative of his wife's estate. He also brings suit as the next friend of his and Mrs. Tapia's four-year-old child ("Child").

9. Mrs. DeHoyos and Mr. Hungerford are LeTisha Tapia's parents, and bring suit in their individual capacities.

10. At all relevant times, GEO Group (aka Wackenhut Corporation) ("GEO") operated the Val Verde County Jail ("Jail"). GEO runs the jail pursuant to a contract with Val Verde County and the United States Marshals Service ("Marshals Service"). GEO was responsible for the training and conduct of the officers working in its facility under the doctrine of *respondeat superior*. At all times, GEO acted under color of law and as the agent, servant, and, as a matter of law, the official representative of Val Verde County and the Marshals Service.

11. Val Verde County is a political subdivision of the State of Texas. Defendant D'Wayne Jernigan is the Sheriff of Val Verde County, and thus the chief administrative officer of the jail. The Marshals Service is a division of a federal law enforcement body. Funds from the County and the Marshals Service are used to operate the jail, employ and compensate jail staff, and assure that, at all times, the jail remains in compliance with federal and state law.

12. At all relevant times, Defendants Eric Dugger and Guillermo Mijares were lieutenants in the Jail, employees of GEO, and acting as agents, servants, and employees of GEO, Val Verde County and the Marshals Service. Mijares and Dugger were on duty at the time Mrs. Tapia was found hanging, and were responsible for her safekeeping and care, including the duty to protect her from self-harm, provide for her serious medical needs, and ensure the adequacy of supervision of her cell. They are sued in their individual capacities.

13. At all relevant times, Defendants Yesica Perez, Amelia Maldonado, Mary Zubov-Zuniga, Denise Austin, Sarah Quintero and Alicia Ramirez were detention officers in the Jail, employees of GEO Group, and acting as agents, servants and employees of GEO, Val Verde County and the Marshals Service. They are sued in their individual capacities.

14. At all relevant times, Defendant Luciano Reyes was a captain in the Jail, an employee of GEO, and acting as an agent, servant and employee of GEO, Val Verde County and the Marshals Service. He is sued in his individual capacity.

3

15. At all relevant times, Defendant Scott was the warden in the Jail, an employee of GEO, and acting as an agent, servant and employee of GEO, Val Verde County and the Marshals Service. He is sued in his individual and official capacities.

## STATEMENT OF FACTS

16. The Marshals Service arrested LeTisha Tapia on January 27, 2004 and booked her into the Val Verde County Jail as a pre-trial detainee. On June 29, 2004, prior to her death, she had pled guilty to a possession of marijuana offense, and was serving time on that plea. She had met with her attorney and a federal probation officer just days before her death, and expected to be released from custody in under a year.

17. Mrs. Tapia had a history of depression and anxiety, and had used antidepressant medications in the past. Jail personnel did not elicit this information at the time of her intake interview.

18. For a period of weeks during her incarceration, Mrs. Tapia was housed in a pod with male inmates. Pods in the Jail have two hallways that surround a common day room. One hallway has cells for minimum security inmates, and the other hallway has cells for maximum security inmates in administrative segregation. Male inmates were kept in the maximum security segregation cells. Mrs. Tapia and other female inmates were in the minimum security cells.

19. Officers Zubov-Zuniga, Maldonado and other unknown security guards allowed the male and female inmates to have contact with each other. Female inmates discovered they could open the cells of the male inmates using a toothbrush. Guards would open the door between the hallways and tell the inmates to "do what you wanna do, or what you gotta do." Some female inmates began to have sexual relations with male inmates. Zubov-Zuniga, Maldonado and other unknown guards knew this was taking place and ignored it. Males and females were housed together in the same pod for more than a month.

20. Mrs. Tapia reported the sexual relations to Warden Scott in April 2004. Warden Scott interviewed her in his office. Despite this, he did not move the male inmates to another section of the jail. Sexual relations between male and female inmates continued.

21. Inmates Laura Muzquiz and Thai Sharkey confronted Mrs. Tapia, and accused her of "snitching." The inmates had learned someone had reported the sexual relations to jail authorities. These inmates told her she had to prove she was not the "snitch" by having sex with a male inmate. These inmates coerced Mrs. Tapia into the cell of Anthony Ramirez, who raped her.

22. Mrs. Tapia reported she had been raped to jail authorities, including Warden Scott and Lt. Dugger. At this time, the male inmates were moved out of the pod and the Val Verde Sheriff's Department began an investigation into Mrs. Tapia's allegations. Mrs. Tapia informed the investigators she had been raped.

23. During this time, Defendant Reyes would leer at the female inmates. During the day, female inmates would frequently dress in only boxer shorts and sports bras because of the heat. They would lay on the floor of their cells on top of a blanket. While the female inmates were dressed this way, Captain Reyes would come to their cell windows and stare at them.

24. After the rape, Mrs. Tapia's mental state began to deteriorate. She became very agitated about the possibility of a long incarceration. She was especially worried about her young child, whom she was afraid would be taken away from her family.

25. Mrs. Tapia reported she was experiencing anxiety and depression to the jail medical staff. On July 14, she told officials she had experienced an anxiety attack. She wrote a medical request marked "URGENT," wherein she stated she had previously been taking the psychiatric medication Xanax. She reported she had attempted to kill herself before by overdosing on psychiatric drugs.

5

26. On July 22, 2004, a psychiatrist examined Mrs. Tapia in the jail infirmary. Mrs. Tapia was left alone in the infirmary, and found a portable telephone, which she used to make several desperate calls to family members while in the infirmary in a failed attempt to speak with her son. Despite reporting her previous suicide attempt, feelings of depression and anxiety and a history of taking psychiatric medications, Mrs. Tapia was returned to her cell. The Jail took no further action to provide Mrs. Tapia with psychiatric care.

27. Mrs. Tapia hid the phone in her pants and took it back to the pod with her. She and other inmates attempted to plug the phone into the outlet in the day room, and were caught by guards.

28. Lieutenant Dugger responded to the pod. He was furious with Mrs. Tapia and began to yell at her. Dugger slammed her against the wall, and told her she would be charged with escape and would spend the next fifteen years in prison.

29. Dugger told Mrs. Tapia's cellmate to remove her property from the cell. Then he, Officers Austin, Quintero, Ramirez and unknown security guards ransacked the cell while removing Mrs. Tapia's property. They destroyed items of her personal property, including photographs of her family.

30. Dugger interrogated Mrs. Tapia about the phone. He made her kneel on the floor and kicked her. He continued yelling at her, calling her a "bitch, low-life prostitute, ho." He threatened to rape her, telling her "if you were my cellmate, I'd make you my bitch." He made fun of her weight, calling her a "pig."

31. Dugger ordered Austin, Quintero, and Ramirez to strip-search Mrs. Tapia. The officers took Mrs. Tapia into one of the segregation cells while Dugger stood at the window and watched. Dugger proceeded to sexually humiliate Mrs. Tapia. When Mrs. Tapia was naked, Dugger told her to "squat and cough" and "spread her cheeks," while he watched.

32. When the search was completed, Mrs. Tapia ran and hid in the pod's shower, and refused to come out. She threatened to kill herself, if she was placed in segregation. Dugger threatened to use tear gas on her if she did not come out. Dugger then dragged Mrs. Tapia from the shower and threw her into a segregation cell.

33. Mrs. Tapia was still completely naked. Captain Reyes and unknown guards refused to provide her with any clothes or bed sheets. She spent the entire night of July 22 alone, naked in the segregation cell. Even in July, the cells became cold at night, especially for an inmate with no clothes or blankets. Officers did not order a pre-segregation psychiatric exam.

34. The next morning, Officer Yolanda Castillo came on duty. She provided Mrs. Tapia with clothes and a blanket, and allowed other inmates to speak with Mrs. Tapia. She went through Mrs. Tapia's property that had been destroyed, and helped piece together some photographs of her family. Castillo's shift was over at 2:30 p.m.

35. Officer Yesica Perez came on duty. Perez would not allow other inmates to speak with Mrs. Tapia, and did not perform inspections of her cell that GEO policy required every fifteen minutes. At about 5:30 p.m., Mrs. Tapia ate her final meal.

36. At about 8:30 p.m., Perez finally checked on Mrs. Tapia. She lifted the shutter over Mrs. Tapia's window, but could not see into the cell because a pair of boxer shorts covered the window. Perez ordered Mrs. Tapia to take down the boxer shorts and come to the door. Mrs. Tapia did not respond.

37. Perez opened the door's food tray door and looked into the cell. She called a "code blue" – medical emergency – over her walkie-talkie.

38. Other officers responded to the scene, including Defendants Dugger and Mijares. The cell door was opened, and Mrs. Tapia was hanging by her bed sheet from the air vent.

7

39. An officer cut the sheet, and Mrs. Tapia's body dropped to the floor with a thud. An unknown officer ordered Defendant Perez to perform CPR, but she refused.

40. Defendants' treatment of Mrs. Tapia was deliberately and callously indifferent to her medical needs and drove her to take her own life. The systematic lack of supervision and adequate medical care for inmates suffering from mental disabilities, including depression, evidenced a custom so persistent, common, widespread and well-settled as to be official municipal policy. But for Dugger and others' brutal and inhumane treatment of Mrs. Tapia, and the callous disregard of Val Verde County, the Marshals Service and GEO, she would still be alive and with her family today.

### CAUSES OF ACTION I AND II – FEDERAL DUE PROCESS AND CRUEL AND UNUSUAL PUNISHMENT

41. Defendants' actions, done under color of law and their authority, intentionally and with conscious, callous and deliberate indifference to LeTisha Tapia's constitutional rights under the Fifth, Eighth and Fourteenth Amendments, deprived her of her due process rights and her right to be free from cruel and unusual punishment.

42. On information and belief, Defendants, acting at the level of official policy and custom, with deliberate, callous, and conscious indifference to Mrs. Tapia's constitutional rights, authorized, tolerated, and institutionalized the practices and ratified the illegal conduct herein detailed, proximately causing the deprivation of Mrs. Tapia's due process and cruel and unusual punishment rights, and the resulting injury suffered, by:

   a) failing and refusing to provide mental health treatment to Mrs. Tapia following her reports of depression, anxiety and rape (as to Defendants Scott, Dugger, Mijares, Jernigan and GEO);

   b) failing and refusing to provide a pre-segregation psychiatric exam before Mrs. Tapia was placed in administrative segregation (as to Defendants Dugger, Austin, Quintero, Ramirez, Reyes, unknown security guards, Jernigan and GEO);

8

c) failing and refusing to take adequate preventative measures upon discovery of suicidal tendencies of an inmate like Mrs. Tapia (as to Defendants Scott, Dugger, Austin, Quintero, Ramirez, Reyes, unknown security guards, Jernigan and GEO);

d) failing and refusing to provide monitoring equipment or frequent observations by staff of cells that house potentially suicidal inmates, including the cell which housed Mrs. Tapia (as to Defendants Dugger, Mijares, Scott, Jernigan, Perez, Reyes, unknown security guards and GEO);

e) physically and mentally abusing Mrs. Tapia by subjecting a depressed and anxious rape victim to placement, while totally nude, in a cold segregation cell after physically assaulting her (as to Defendants Dugger, Mijares, Scott, Austin, Quintero, Ramirez, Reyes, unknown security guards, Jernigan and GEO);

f) housing Mrs. Tapia with dangerous male inmates – one of whom raped her after she reported the dangerous conditions to the highest authorities in the jail (as to Defendants Scott, Dugger, Maldonado, Zubov-Zuniga, Jernigan and GEO); and,

g) mentally abusing Mrs. Tapia, by subjecting her to the stares of male guards, while she was nude or near-nude, after she had been raped by a fellow inmate (as to Defendants Reyes, Jernigan and GEO).

### CAUSES OF ACTION III AND IV –
### AMERICANS WITH DISABILITIES ACT AND SECTION 504

43. Val Verde County has been, and is, a recipient of federal funds, and thus covered by the mandate of Section 504. Section 504 requires that recipients of federal monies reasonably accommodate persons with mental disabilities in their facilities, program activities, and services and reasonably modify such facilities, services and programs to accomplish this purpose. Defendant Marshals Service is an arm of the executive branch, and thus subject to the requirements of the Rehabilitation Act.

44. Further, Title II of the ADA applies to Val Verde County and the Marshals Service, and Title III applies to GEO. Titles II and III have essentially the same mandate as Section 504.

45. The Val Verde County Jail is a facility, and its operation comprises a program and service, for Section 504 and ADA purposes.

46. Val Verde County, the Marshals Service, and GEO failed and refused to reasonably accommodate Mrs. Tapia's mental disabilities (depression and anxiety), in violation of the ADA and Section 504, when she was in the jail. That failure and refusal caused her death.

47. Val Verde County, the Marshals Service, and GEO failed and refused to reasonably modify their facilities, services, accommodations and programs to reasonably accommodate Mrs. Tapia's mental disability, in violation of the ADA and Section 504. That failure and refusal caused her death.

48. Because a direct result of Val Verde County, the Marshals Service and GEO's violations of the ADA and Section 504 was the death of Mrs. Tapia, Plaintiffs sustained those damages described in the preceding paragraphs, for which they are entitled to recover.

49. Mr. Tapia also is entitled to recover, as the representative of Mrs. Tapia's estate, for those damages she sustained, as described.

### CAUSE OF ACTION V – TEXAS TORT CLAIMS ACT

50. Plaintiffs assert a claim under the Texas Tort Claims Act, Tex. Civ. Practice & Remedies Code § 101.021, against Val Verde County for the negligent, grossly negligent, and reckless care and custody of Mrs. Tapia while she was a pretrial detainee of the jail, including, but not limited to, the use and misuse of tangible property (the jail issued bed sheet and air vent, both of which she was found hanging from) and the failure to comply with a reasonable standard of care. This claim arises from the performance of a proprietary function so that sovereign immunity is waived by the Act.

### CAUSE OF ACTION VI – FEDERAL TORT CLAIMS ACT

51. Plaintiffs assert a claim under the Federal Tort Claims Act, 28 U.S.C. § 2674, against the Marshals Service for the negligent, grossly negligent, and reckless care and custody of Mrs. Tapia while she was a pretrial detainee of the jail, and the failure to comply with a reasonable

standard of care. This claim arises from the performance of a proprietary function so that sovereign immunity is waived by the Act. Plaintiffs have submitted a claim to the Marshals Service, a prerequisite for filing this action under 28 U.S.C. § 2675, and received a final rejection letter.

## CAUSE OF ACTION VII – COMMON LAW TORT CLAIMS

52. Plaintiffs assert common law assault, battery, invasion of privacy and intentional infliction of emotional distress claims against Lt. Dugger for his brutal and inhumane treatment of Mrs. Tapia following the search of her cell. Dugger verbally threatened her with increased charges, exposure to dangerous gas and rape. Dugger physically kicked her and manhandled her during the search. Dugger watched Mrs. Tapia during the strip search, causing her severe sexual humiliation and emotional trauma. Plaintiffs also asserts these claims against GEO as *respondeat superior*.

53. Plaintiffs assert common law invasion of privacy and intentional infliction of emotional distress claims against Capt. Reyes, and against GEO as *respondeat superior*. Reyes would leer at Mrs. Tapia while she was in a state of undress and intimidate her, despite being aware of the sexually dangerous atmosphere in the jail, and that Mrs. Tapia had been raped.

54. Plaintiffs assert common law negligence claims against Dugger, Perez, Mijares, Scott, Zubov-Zuniga, Maldonado, Austin, Quintero, Ramirez, and unknown guards, and GEO as *respondeat superior*.

    a) Dugger assaulted and sexually humiliated Mrs. Tapia while she was suffering from depression and anxiety and recovering from a terrible rape. Placing her under additional psychological pressure was a proximate cause of her suicide. Dugger additionally failed to order a pre-segregation psychiatric evaluation, as is required by GEO policy, before placing Mrs. Tapia in a segregation cell;

    b) Austin, Quintero, Ramirez and Reyes allowed Dugger to place Mrs. Tapia in administrative segregation without the required psychiatric evaluation, even after witnessing the abuse Dugger inflicted upon Mrs. Tapia;

11

c) Perez failed to inspect Mrs. Tapia's cell every ten to fifteen minutes, as GEO policy requires for potentially suicidal inmates. Perez's failure to inspect Mrs. Tapia's cell was the "but for" cause of her suicide;

d) Mijares failed to ensure that Perez conducted the required inspections, as was his duty as the jail's commanding officer at the time of Mrs. Tapia's suicide;

e) Scott failed to order adequate protection for Mrs. Tapia after she reported the sexual relations being conducted in the jail to him. Placing Mrs. Tapia back in the same cell block as the male offenders who she had reported were having sex with female inmates proximately caused her rape; and,

f) Zubov-Zuniga and Maldonado allowed and facilitated the female inmates to have contact with the male inmates, in violation of GEO policy. Their actions created the environment which proximately caused the rape of Mrs. Tapia.

### CAUSE OF ACTION VI – TEXAS WRONGFUL DEATH ACT

55. Mr. Tapia asserts a claim under the Texas Wrongful Death Act, Tex. Civ. Prac. & Rem. Code § 71.002, for his wife's wrongful death. As a direct and proximate cause of Defendants' acts that resulted in his wife's death, he has suffered damage to the husband-wife relationship, including loss of society, companionship, consortium, affection, comfort, and love. Mr. Tapia has also suffered mental anguish, grief, and sorrow and is likely to continue to suffer for long into the future. For these losses, Mr. Tapia seeks damages in the maximum amount allowable by law.

56. Mr. and Mrs. Tapia's child has suffered pecuniary loss from his mother's death, including loss of inheritance, loss of care, maintenance, support, services, advice, counsel, and contributions of pecuniary value that he, in all reasonable probability, would have received during his lifetime, had she lived. He has suffered additional loss because of the destruction of the parent-child relationship, including society, emotional support, and happiness. He has also suffered severe mental anguish, grief, and sorrow as a result of his mother's death, and is likely to continue to suffer far into the future. For these losses, he should receive the maximum amount of damages allowable by law.

57.  Mr. Hungerford and Mrs. DeHoyos assert a claim under the Texas Wrongful Death Act, Tex. Civ. Prac. & Rem. Code § 71.002, for their daughter's wrongful death. As a direct and proximate cause of Defendants' acts that resulted in their daughter's death, they have suffered damage to the parent-child relationship, including loss of society, companionship, consortium, affection, comfort, and love. Mr. Hungerford and Mrs. DeHoyos have also suffered mental anguish, grief, and sorrow and are likely to continue to suffer for long into the future. For these losses, they seek damages in the maximum amount allowable by law.

## CAUSES OF ACTION: SUMMARY

58.  Plaintiffs sue the following persons and entities for the following relief, jointly and severally:

a)  Defendant Dugger, in his individual capacity, for assault, battery, invasion of privacy, intentional infliction of emotional distress, negligence, wrongful death, and violations of Mrs. Tapia's Fourteenth Amendment rights, for monetary damages;

b)  Defendant Mijares, in his individual capacity, for negligence, wrongful death, and violations of Mrs. Tapia's Fourteenth Amendment rights, for monetary damages;

c)  Defendant Scott, in his individual capacity, for negligence, wrongful death, and violations of Mrs. Tapia's Fourteenth Amendment rights, for monetary damages;

d)  Defendant Scott, in his official capacity, for violations of Mrs. Tapia's Fourteenth Amendment rights, for injunctive and declaratory relief;

e)  Defendant Reyes, in his individual capacity, for invasion of privacy, intentional infliction of emotional distress, and violations of Mrs. Tapia's Fourteenth Amendment rights, for monetary relief;

f)  Defendant Maldonado, in her individual capacity, for negligence, and violations of Mrs. Tapia's Fourteenth Amendment rights, for monetary relief;

g)  Defendant Zubov-Zuniga, in her individual capacity, for negligence, and violations of Mrs. Tapia's Fourteenth Amendment rights, for monetary damages;

h)  Defendant Austin, in her individual capacity, for negligence and violations of Mrs. Tapia's Fourteenth Amendment rights, for monetary damages;

i)     Defendant Quintero, in her individual capacity, for negligence and violations of Mrs. Tapia's Fourteenth Amendment rights, for monetary damages;

j)     Defendant Ramirez, in her individual capacity, for negligence and violations of Mrs. Tapia's Fourteenth Amendment rights, for monetary damages;

k)     Defendant Jernigan, in his official capacity, for wrongful death and violations of Mrs. Tapia's Fourteenth Amendment rights, for monetary damages, and injunctive and declaratory relief;

l)     Defendant GEO for the above torts (under the doctrine of *respondeat superior*), violations of Title III of the ADA, violations of Section 504, and wrongful death;

m)     Defendant Val Verde County for violations of Title II of the ADA, violations of Section 504, and violations of the Texas Tort Claims Act; and,

n)     Defendant United States for violations of Title II of the ADA, violations of Section 504, and violations of the Federal Tort Claims Act.

59. Mr. Tapia brings the claims for personal injuries suffered by Mrs. Tapia through the Texas Survival Statute, Tex. Civ. Prac. & Rem. Code § 71.021, as representative of her estate. Under this statute, he is allowed to recover the maximum amount of compensatory damages allowed by law, as well as exemplary damages against GEO, Dugger, Mijares, Maldonado, Zubov-Zuniga, Perez, Reyes and unknown guards, to the extent allowed by law.

## DECLARATORY RELIEF

60. Plaintiff requests all appropriate declaratory relief that can be granted by this Court.

## ATTORNEYS' FEES AND COSTS

61. Pursuant to 42 U.S.C. § 1988, Plaintiff is entitled to recover attorneys' fees and costs. Plaintiffs also request an award of attorneys' fees, costs, and expenses against all Defendants for their ADA and Section 504 claims, pursuant to 42 U.S.C. § 12205.

## PRAYER FOR RELIEF

THEREFORE, Plaintiffs requests that the Court:

A.     Award punitive damages against all individual Defendants, as appropriate and as allowed by law;

B.  Award compensatory damages against all Defendants, jointly and severally, as allowed by law;

C. Grant declaratory and injunctive relief under federal and state law, as set out in this Complaint;

D. Grant reasonable attorneys fees, litigation expenses and court costs; and,

E. Grant such other and further relief as appears reasonable and just, to which Plaintiffs may be entitled.

Dated: June 22, 2006.

Respectfully Submitted,

James C. Harrington
State Bar No. 09048500
Scott Medlock
State Bar No. 24044783
Wayne Krause
State Bar No. 24032644

TEXAS CIVIL RIGHTS PROJECT
1405 Montopolis Dr.
Austin, TX 78741
  (512) 474-5073 [phone]
  (512) 474-0726 [fax]

ATTORNEYS FOR PLAINTIFFS